These consolidated cases result from an automobile accident which occurred on July 22, 1947, on the Metairie Ridge Road in the vicinity of the Labarre Road, in the Parish of Jefferson, at a point at which a private driveway leads from the Metairie Ridge Road to a store nearby. The vehicles which were involved were a taxicab, which was owned by Wallace C. LeBrun, and which was being driven by Eunice Paul Vedros, and a Stake body truck, which was being operated by Lloyd M. Dennis, an employee of American Paper Manufacturing Company, Inc., the owner of the truck. The two vehicles were being driven in the same direction toward the City of New Orleans, the truck being ahead and the taxicab in the rear. The driver of the truck intended to turn to the left in order to enter the roadway leading from the highway to the already mentioned store, and as he did so the taxicab, which was about to pass the truck on its left side, ran into the left side of the truck, damaging it and the taxicab and causing physical injuries to Lawrence Doublet, Sr., an employee of American Paper Manufacturing Company, Inc., who was a passenger in the truck, being seated in the rear portion thereof.
LeBrun, the owner of the taxicab, brought the first of these suits, claiming $398.00 as the cost of repairing his taxicab, and $225.00, which he asserts represents the loss resulting from being deprived of the use of his taxicab for ten days. These two figures make a total of $623.00 (incorrectly added by plaintiff in his prayer in which he claims $625.00). LeBrun made defendants the American Paper Manufacturing Company, Inc., and The Employers' Liability Assurance Corporation, Ltd., alleging the latter corporation to be the liability insurance Carrier of the former. LeBrun charged that the accident had resulted from the following acts of negligence on the part of Dennis, the driver of the truck:
"* * * the truck driver turned sharply and abruptly into the driveway of the Beverly Food Store, thus making a left turn; that the truck driver gave no warning that he would make a left hand turn;
"* * * that at the time that the truck driver began to make the left hand turn without warning, the said truck was on the extreme right side of the road; that the truck was being driven at approximately 20 miles per hour and the taxi at approximately 25 miles per hour; * *"
LeBrun charges also that the width of the body of the truck was such that it prohibited
"the view of any hand signal which the truck driver might give to any traffic behind the said truck * * *."
And he charges, too, that
"the truck was loaded with large boxes, blocking the view of the truck driver of any traffic at the rear or on the side."
In the second suit, Doublet, alleging that he had sustained physical injuries and that the accident had been caused by negligence of the operator of LeBrun's taxicab, prayed for judgment against LeBrun in the sum of $1019.20. He alleged that the said taxicab *Page 96 
driver was guilty of the following acts of negligence: That he was proceeding in a negligent and careless manner at a speed of approximately 40 miles an hour, in excess of the speed limit of 25 miles per hour; that he failed to have the taxicab under control; that he did not operate the taxicab at a safe distance behind the truck; that he did not blow the horn of the taxicab as he attempted to pass the truck, and that he failed to yield to the truck the right to turn to its left, in spite of the fact that the driver of the truck signalled that he intended to slow down and was about to make a left hand turn.
In the first of these suits in which LeBrun prayed for judgment against the corporate defendants, those defendants denied any negligence on the part of the driver of the truck and averred that the said driver had given a proper hand signal, indicating his intention to turn to the left, and that the accident had been caused by the negligence of the driver of the taxicab in attempting to pass the truck at a high rate of speed without signalling, and in spite of the fact that the driver of the truck had signalled his intention of turning to the left.
The American Paper Manufacturing Company, Inc., then assumed the position of plaintiff in reconvention and prayed for judgment against LeBrun for $45.00, alleging this to be the cost of repairing the damage to its truck, and The Employers' Liability Assurance Corporation, Ltd., assumed the position of plaintiff in reconvention and prayed for judgment against LeBrun for $28.00, alleging that to be the amount it had expended for medical attention to Doublet, The Employers' Liability Assurance Corporation being not only the liability insurance carrier of the said American Paper Manufacturing Company but also having protected it by a policy of workmen's compensation insurance.
Let us say here that none of the amounts claimed is in dispute except that which LeBrun claims as the loss sustained as the result of being deprived of the use of the taxicab for ten days. In other words, the corporate defendants admit that if LeBrun is entitled to recover for damage to his taxicab, that damage amounted to $398.00, and LeBrun admits that if the two corporations are entitled to recover against him in reconvention, the American Paper Manufacturing Company is entitled to $45.00, representing the damage to its truck, and the insurance Company is entitled to $28.00 as the amount expended for medical attention to Doublet.
In the first suit — that of LeBrun against the two corporate defendants — there was judgment in favor of LeBrun and against the two defendants for $398.00 in solido, with legal interest from judicial demand. The two reconventional demands were dismissed. In the second suit there was judgment dismissing the claim of Doublet at his cost.
The American Paper Manufacturing Company, Inc., and The Employers' Liability Assurance Company, Ltd., appealed suspensively from the judgment against them, and Doublet appealed from the judgment dismissing his suit against LeBrun.
LeBrun answered the appeal of the two corporations, praying that the amount awarded him be increased to $625.00, again incorrectly totalling the two items of his claim which in fact amounts to only $623.00.
There is in reality no dispute concerning the statutory law which is applicable. There are certain provisions of the Louisiana Highway Regulatory Act, No. 286 of 1938, which define the duties of the driver of a vehicle who desires to turn to his left, and there are others which set forth the precautions which must be taken by the operator of a vehicle who desires to pass another vehicle which is ahead We quote at length from that statute. Rule 9 of Section 3 reads as follows:
"Turning. (a) The driver of any vehicle on the public roads, highways and bridges of this State shall ascertain, before turning around upon any such road, highway or bridge, that there is no traffic, vehicular or pedestrian, approaching from either direction which will be unduly or unnecessarily delayed and shall yield right-of-way to such approaching traffic and shall not attempt to make a turn unless and until the said way is clear. *Page 97 
"(b) Except as otherwise provided in this Section, the driver of a vehicle intending to turn to the right at an intersection shall approach such intersection in the lane for traffic nearest the right hand side of the highway, and in turning shall keep as closely as practicable to the right hand curb or edge of the highway, and when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning such vehicle to the left.
"(c) For the purpose of this Section, the center of the intersection shall mean the meeting point of the medial lines of the highways intersecting one another."
Rule 7 of Section 3 defines the duties of the driver of an overtaking motor vehicle.
"Overtaking Motor Vehicle. (a) The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle.
"(b) The driver of an overtaking vehicle shall give audible and sufficient warning of his intention before overtaking, passing or attempting to pass a vehicle proceeding in the same direction.
* * * * * *
"(f) The driver of a vehicle upon the public roads, highways or bridges of this State, who has been given adequate warnings by an overtaking and passing vehicle, approaching from the rear, shall promptly give way to his right in favor of such overtaking and passing vehicle and shall not increase the speed of his vehicle until it has been completely overtaken and passed by the overtaking and passing vehicle; provided, however, that nothing herein shall mitigate against the provisions for prima facie responsibility provided for in this rule."
Rule 8 of Section 3 reads, in part, as follows:
"Following Vehicles. (a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and condition of the highway."
It is the contention of the two corporate defendants in the first suit and of Doublet in the second suit that, as the driver of the truck approached the private roadway into which he desired to turn to his left, he substantially reduced the speed of the truck and extended his left hand and thus gave the proper signal of his intention to turn to the left. Dennis, the driver of the truck, says that when he did this, he looked into the rear view mirror and could not discover that there was any other vehicle on the road in the rear of the truck. It is the contention of LeBrun, on the other hand, that as Vedros, the operator of LeBrun's taxicab, neared the truck he sounded his horn several times and then swerved to the left in an effort to pass around the truck; that no hand signal or other warning was given by the truck operator, and that just as the taxicab had reached a point about opposite the left rear wheel of the truck, the truck was suddenly swerved to its left directly across the path of the taxicab, which then crashed its right front fender into the left side of the truck just to the rear of the left front fender of the truck.
Doublet, in addition, contends that even if the driver of the truck was at fault, the proximate cause of the accident was the negligence of Vedros, the driver of the taxicab and that, therefore, if both drivers were negligent, he is not deprived by the negligence of Dennis of his right to recover from LeBrun, for the reason that if a person is injured by the joint negligence of two others, the injured party may recover from either or both of the joint-tort feasors.
The only disinterested eye witness was Mr. Herbert Huber who, at the time of the accident, was in the employ of a private corporation, but who, when he testified, was a deputy sheriff of the Parish of Jefferson. Mr. Huber was operating another automobile on the same road and was going in the same direction in which the other two vehicles were being driven. He was in the rear of the truck, and he says *Page 98 
that the taxicab passed his car to its left and that then, before its driver attempted to pass the truck, he sounded the horn several times. He says that he did not see any hand signal given by the driver of the truck, and that just as the taxicab was about to pass the truck, the latter vehicle was swerved suddenly to its left when it was too late for the taxicab to stop.
Doublet was riding in the rear of the truck. He says that he did not see the taxicab because of a tarpaulin which was thrown over a portion of the body of the truck and which prevented his seeing to the rear. It is shown that the body of the truck was considerably wider than was its cab, extending on each side a distance variously estimated at from 15 to 20 inches beyond the side of the cab. And it is shown, too, that the tarpaulin extended over the side of the truck a short additional distance.
Dennis, the driver of the truck, says that he knew of these conditions and that when he extended his arm, his hand was considerably beyond the obstruction which resulted from the body of the truck and the tarpaulin, and that it could easily have been seen from the rear.
Vedros, the operator of the taxicab, says that no hand signal was given by Dennis; that he blew his horn several times before he attempted to pass the truck, and that he could easily have passed it except for the fact that the truck turned suddenly to the left when it was too late for him to stop.
We think it very obvious that if Dennis extended his hand, it must not have been seen by the driver of the taxicab who surely would not have deliberately crashed into the side of the truck had he noticed any signal indicating the intention of the driver of the truck to turn across the roadway ahead of him.
Counsel for the two corporate defendants and Doublet say that it is obvious that the reason Huber did not see the hand signal which was given by the driver of the truck was that between him and the truck was the taxicab of LeBrun.
It is argued on behalf of the corporate defendants and of Doublet that even if no hand signal was given by the driver of the truck, the operator of the taxicab should have been aware of the fact that the truck was to be turned to its left because of the private roadway which led from the highway and because of the fact that as the truck approached that point its speed was substantially reduced.
The evidence does show that the speed of the truck was somewhat reduced and that probably as the truck attempted to make the turn it was proceeding at a speed of about twelve or fifteen miles per hour. We think, however, that it does not show that the speed of the truck had been so much reduced as to indicate to the driver of the taxicab that it was the purpose of the driver of the truck to turn to the left.
We do not find convincing the testimony of Dennis, the driver of the truck. At first he said that before turning the truck to its left he brought it to a complete stop and looked into the rear view mirror, and that there was no traffic behind it. He admitted that there was nothing to prevent his seeing anything in the roadway to the rear except for a space of about ten feet immediately behind the truck, so that surely if he did look he must have seen either or both of the other vehicles which obviously were in the roadway behind the truck. Dennis later changed his testimony as to stopping, and said that he did not come to a complete stop, but that he "wasn't going at any speed at all", and he continued to insist that he looked into the rear view mirror and saw no other vehicles.
We conclude, without finding it necessary to enter upon a detailed discussion of the remaining evidence, that Dennis did not look to his rear; did not make certain that it was safe to turn, and did not extend his arm to indicate his intention to turn to the left. A turn to the left across the roadway is a dangerous maneuver, and it is well settled that it should not be attempted unless the operator who intends to make such a turn makes certain that it is safe to do so, and unless he gives such signal as is required to indicate his intention to make such a turn. *Page 99 
Counsel for Doublet insist, however, that even if we find that Dennis was at fault, still Doublet should be permitted to recover from LeBrun because of the concurrent negligence of Vedros. However, we fail to find any negligence in Vedros. The evidence convinces us that the speed of his taxicab was not excessive; that he sounded his horn several times before he attempted to pass the truck, and that there was nothing which he could see which indicated to him that it was the intention of Dennis to turn.
Counsel for the corporate defendants and for Doublet cite three cases, each of which they say is authority for the position taken here. These cases are: Burns v. Evans Cooperage Co., 208 La. 406, 23 So.2d 165; Kelly v. Neff, La. App.,14 So.2d 657, and Goynes v. St. Charles Dairy, Inc., La. App., 197 So. 819.
In the Burns case, the Supreme Court found facts which, to some extent, were similar to those presented here. There, a very large truck was about to turn to its left into an intersecting road when its driver saw, approaching from the rear, another automobile coming at a very high speed. Apparently he realized that he should not turn to his left and he stopped the truck. The driver of the other vehicle, coming at tremendous speed, in an effort to avoid hitting the truck which was stopped in the road ahead of him, turned to his left "zigzagged and skidded for a considerable distance and finally ran into the ditch on the upper end * * * of the side road. [208 La. 406, 23 So.2d 167] There seems to have been no doubt at all that the driver of the truck gave all necessary signals and brought the truck to a stop and that the accident was caused entirely by the negligence of the driver of the second vehicle. The Supreme Court set forth the law applicable in such situations in the following language:
"The first question to be determined in this case is whether the driver of defendants' truck is chargeable with the act of negligence complained of by plaintiff, with the burden of proof resting upon plaintiff to establish the alleged negligent act. If, as alleged by plaintiff, the driver of defendants' truck suddenly and without warning turned the truck to the left on the highway at the time plaintiff was passing in his automobile, thereby causing plaintiff to run the automobile into the ditch, defendants are liable. If, on the other hand, as alleged by defendants, the driver of their truck did not turn the vehicle to the left, but slowed down and came to a stop after giving the necessary signal preparatory to making the turn to the left and plaintiff, disregarding the signal, cut to the left off the highway onto the abutting gravel road, skidding for a considerable distance thereon and finally crashing into the ditch, defendants are not liable."
In Kelly v. Neff, supra, the facts were somewhat similar, but there again the Court held plainly that the accident was caused by the excessive speed of the second car. The Court said that the driver of the leading car, having ascertained, by looking to the rear, that he could make the turn safely, was within his rights in doing so, and that he did not have to wait until there were no vehicles whatever in the road behind him, and that the only cause for that particular accident was that the driver of the following car was operating it at a dangerously excessive speed.
In Goynes v. St. Charles Dairy, Inc., supra, the Court found that the driver of the second car was at fault in running into the leading car, because the driver of the leading car was operating it at a very slow speed and had given a hand signal showing that he intended to turn to the left. Counsel, however, point to certain language in the opinion in that case as indicating that even without the giving of a hand signal the following vehicle should be warned, by the reduction in speed of a car ahead, that the car ahead is to be turned to the left. He points to the following language [197 So. 821]:
"* * * It is further our opinion that the cause of the accident was the fact that the truck was being driven too close to the forward car and at an excessive rate of speed taking into consideration its proximity to this car, together with the *Page 100 
failure of the driver to notice the signal and the slowing down motion of plaintiff's car in preparation for the left turn."
We quite agree that if the speed of the leading car is so substantially reduced as to indicate an intention to stop or to turn that the driver of a following car should be warned of the possibility of danger. But we find that the facts here do not justify the application of that rule. Furthermore, in the Goynes case it is evident that the real reason for the decision was that the second car was being driven too close to the leading car and at an excessive speed.
We repeat that we have no difficulty in concluding that the sole cause of the accident in the case at bar was the negligence of Dennis, the driver of the truck.
It is conceded that the repairs to the taxicab cost $398.00, which item is not in dispute, and we have left for consideration only the question of whether LeBrun is entitled to recover for the loss resulting from his being deprived of the use of his taxicab while it was being repaired. It is well settled that in such a situation the owner of a taxicab is entitled to recover for such loss. In Tornabene v. Rau, La. App., 34 So.2d 655, 657, we found facts, concerning the use of a taxicab, very similar to those presented here, and there we said:
"Plaintiff has been engaged in the business of operating a taxicab for about six years. He operated the cab himself during the daylight hours, and at night rented it to another driver and received rental of $5 per night. The automobile, while being repaired, was out of operation for a period of seven days, and plaintiff lost the night rental for that period, besides his earnings, which he testified were from $8 to $10 per day, from his own operation of the cab."
In Lucia v. De Lage, La. App., 36 So.2d 53, 55, appears the following:
"In Drewes v. Miller et al., La. App., 25 So.2d 820, 823, we said:
" 'The law relating to the right of an owner of a damaged vehicle to recover damages for loss of its use is well settled. * * *'
"In Tornabene v. Rau [La. App.], 34 So.2d 655, we were presented with a claim of a taxicab operator who was deprived of its use while it was undergoing repairs. He operated the cab himself in the day time and rented it to another driver at night. We allowed recovery for the loss of rent as well as for the loss which he sustained because he could not himself operate it during the day. See also Adam v. English, La. App.,21 So.2d 633. Plaintiff should have been allowed recovery on this item of damage."
Plaintiff's testimony is that the taxicab was operated twenty-four hours a day; that he himself drove it for twelve hours, and usually made in those twelve hours a profit of about $15.00, and that in the other twelve hours it was driven by Vedros, as his employee, under an agreement by which he and Vedros divided the profits made in those twelve hours. He said that the profit made in those twelve hours amounted to about $15.00 and that his half of this was $7.50, which, when added to the $15.00 which he himself made, amounted to $22.50 a day, which was the loss sustained by him.
There is nothing in any way to contradict or refute this testimony of LeBrun. In view of the jurisprudence which we think is applicable, he should be permitted to recover $225.00, in addition to the $398.00 awarded him in the judgment in the District Court.
Accordingly, in the matter entitled Wallace C. LeBrun v. American Paper Manufacturing Company, Inc., and The Employers' Liability Assurance Corporation, Ltd., No. 19259 of our docket, the judgment appealed from is amended by the increase of the amount to $623.00, and as thus amended, it is affirmed, defendants to pay all costs.
And in the matter entitled Lawrence Doublet, Sr. v. Wallace C. LeBrun, No. 19,260 of our docket, the judgment appealed from is affirmed at the cost of appellant.
Judgment amended and affirmed (No. 19259).
Judgment affirmed (No. 19260).
REGAN, J., absent. *Page 101